[Cite as *In re S.W.*, 2021-Ohio-2065.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re S.W., R.W., J.W.

Court of Appeals No.  L-20-1204

Trial Court No.   JC 18270763

**DECISION AND JUDGMENT**

Decided:  June 21, 2021

* * * * *

Christopher S. Clark, for appellant.

David T. Rudebock, for appellee.

* * * * *

**OSOWIK, J.**

## I.  Introduction

{¶ 1} Following a trial, the Lucas County Court of Common Pleas, Juvenile Division terminated parental rights as to three children, S.W., R.W. and J.W., and awarded permanent custody of them to Lucas County Children Services ("LCCS").  The

children's mother, T.F. ("mother") appealed the judgment. The fathers, R.Y., S.S., and K.R., did not participate in the trial and have not appealed. As set forth below, we affirm.

## II. Background

### A. The family becomes involved with LCCS.

{¶ 2} This case involves three half siblings: S.W., R.W., and J.W. A fourth half-sibling was born during the pendency of this case and is the subject of a different proceeding.

{¶ 3} In June of 2018, a referral was made to LCCS regarding a claim of physical abuse by mother against her younger son, J.W. At the time, mother and children were staying at a homeless shelter in Toledo, and mother was alleged to have punched J.W., aged six, in the chest and slapped him in the face. The incident was captured on video. J.W.'s older sister, R.W., was nine, and his older brother, S.W. was 14.

{¶ 4} An "unannounced home visit" was planned for June 29, 2018, because mother was not returning the agency's phone calls. By then, the family had moved to a different Toledo shelter. When LCCS caseworker Emily Costell arrived there, the family was outside, and mother appeared to be removing leaves from a stick, in preparation of "whoop[ing]" J.W. with it. Mother was described as "very upset" and J.W. as "scared" and "run[ning] away from" mother. Costell intervened. During their conversation, mother said she was "trying to protect her son" by "saving him" from running into traffic. She complained that J.W., who is reportedly autistic, didn't "listen." Mother was not receptive to Costell's attempt to explain the difference between "discipline" and "abuse."

2.

{¶ 5} Two months later, in August of 2018, mother was asked to leave the shelter, and LCCS helped mother to arrange housing at two successive hotels.  Mother agreed to a temporary custody agreement with LCCS on August 30, 2018.  At that time, there were concerns that the children "looked like they were getting thinner."  After the children were removed from mother's care, it was learned that they had not been to the dentist "for years," despite "known dental problems," that J.W. had not treated with a pediatrician "for years either," and the two older children were frequently truant from school.

### B.  LCCS files a complaint, and a case plan is developed.

{¶ 6} On September 26, 2018, LCCS filed a complaint in dependency, neglect and abuse, and an emergency shelter care hearing was held.  The court found probable case and awarded interim temporary custody to LCCS.  Following an adjudication and dispositional hearing on December 13, 2018, S.W. and R.W. were found to be dependent and neglected, and J.W. was found to be abused, dependent and neglected.  The court awarded LCCS temporary custody.

{¶ 7} A case plan was developed that ordered mother to attend parenting and housing classes and to complete a dual diagnostic assessment.  After the assessment, it was recommended that mother receive individual therapy, which she obtained from Harbor Behavioral Healthcare.  Mother "wasn't engaging in the beginning" and "denied that she ever did anything to harm the children."  Her attendance improved in early 2019, when she was told that she "couldn't start her parenting" classes until she had "significant progress in her mental health."

3.

{¶ 8} After their removal from mother, the children were initially placed together. But, when R.W. displayed "aggressive" behavior toward her younger brother and stole and destroyed property belonging to her older brother, she was moved to a different foster home. R.W. reportedly "talk[ed] with imaginary friends" who seemed "life-like to her." LCCS was told that R.W. likely developed imaginary friends as a "coping mechanism for neglect." Similarly, J.W. also displayed deeply concerning behaviors, such as "urinating [throughout] the [foster-home]," "smearing feces" on the walls, showing "his privates" on the school bus, and stealing from others.

{¶ 9} Mother's visits with her children were set at the most restrictive (Level 1) by LCCS. They were temporarily relaxed to Level 2 but reverted back to Level 1 in September of 2019, after two "serious" claims of physical abuse were made against mother. The first involved a report, later substantiated, that mother had slapped R.W., leaving a "red hand mark" on R.W.'s face. The second incident involved a claim by J.W. who complained that mother had pinched him on the back of the neck, leaving a mark. That report was unsubstantiated, but the record indicates that J.W. told the GAL, the caseworker, and his doctor that "the marks on his upper back" were caused by his mother. On October 24, 2019, after the second incident, the guardian ad litem filed a motion to suspend visitation between mother and R.W. and J.W. Following a hearing, the trial court granted the motion. The eldest child, S.W. was allowed to continue to communicate with mother, which happened sporadically, by phone.

4.

**C. LCCS moves for permanent custody, and a trial is held.**

{¶ 10} On July 17, 2020, LCCS filed a motion for permanent custody, and three-day trial was held, beginning on October 14, 2020. In all, six witnesses testified: two LCCS caseworkers (Emily Costell and Rhonda Nicholson), J.W.'s therapist (Diane Sweinhagen), R.W.'s therapist (Anna Leck), mother, and the guardian ad litem (Christine Kimberly). A summary of their testimony if set forth below.

**The LCCS Caseworkers**

{¶ 11} Caseworker Emily Costell served as the ongoing caseworker for over two years, from June of 2018 until August of 2020. Costell testified that, after the children's removal, they continually disclosed more and more incidents of "daily whoopings" by their mother.

{¶ 12} According to Costell, mother's "compliance at the beginning of the case was very slow," but it "increased" after the children were removed. Costell agreed that mother had "basically" complied with the case plan by maintaining independent and stable housing and by attending parenting classes and individual therapy sessions. Nonetheless, Costell supported permanent custody being awarded to LCCS because, despite mother's compliance, she had failed to accept responsibility or to acknowledge the trauma that her children had experienced. When Costell tried to talk to mother about R.W. and J.W.'s "behaviors or delays," mother would "just say 'that wouldn't be happening if the kids were home with me.'" During Costell's last home visit with mother on August 19, 2020—nearly two years into case-planning services—mother told Costell

5.

that "she never did anything to harm her children and that she's never done anything to make them fearful of her."

{¶ 13} After their removal but before visits with mother were suspended, R.W. and J.W. "would throw fits" and "tantrums" when it was time to visit with mother. Costell described the children as "fearful of their mother" and said that they "do not want to go home."  The two younger children, R.W. and J.W., told Costell that "they love their mom and they miss their mom, and they are okay with seeing her, but they do not want to live with her."  In Costell's opinion, it would be unsafe for the children to be returned to mother's care.

{¶ 14} Rhonda Nicholson briefly served as the ongoing caseworker, beginning in August of 2020.  According to Nicholson, mother failed to comply with LCCS's request that mother attend a second parenting course at A Renewed Mind.  As of the hearing date, mother had failed to attend the orientation, on three separate occasions.

### The Children's Therapists

{¶ 15} Diane Sweinhagen and Anna Leck are licensed professional clinical counselors with the Cullen Center.  In July of 2019, LCCS requested that Sweinhagen provide "family therapy" to mother and J.W. and that Leck provide family therapy to mother and R.W.

{¶ 16} Before family counseling could begin, mother was asked to write a "clarification and protection" letter to her children that acknowledged and accepted responsibility for "any neglect or abuse."  The purpose of the letter was to "help foster trust" between mother and children by discussing what mother would do "differently" in

6.

the future. Mother provided a letter to Sweinhagen in October of 2019 that "was not sufficient to start therapy." Although mother rewrote the letter, family counseling was never achieved, for multiple reasons. First, the counselors recommended against it because neither J.W. nor R.W. felt "safe * * * sharing any emotions or feelings or thoughts" with mother. Ms. Leck also expressed "concerns" regarding mother's "readiness to engage in family therapy effectively if she was unable to accept [R.W.'s] feelings and take responsibility for [R.W.'s] traumatic experiences." The counselors also cited the suspension of visits between mother and children by LCCS as another reason to postpone family therapy.

{¶ 17} So, instead of family therapy, Sweinhagen provided "trauma therapy" to J.W., whom she described as "emotionally [un]stable." According to Sweinhagen, J.W. was "fearful of [mother]" because she "hit[] him" and was "not * * * very kind to him." J.W. exhibited "trauma symptoms" such as an "inability to control his bowels and his bladder, his spacing out. His inability to concentrate in school, the multiple scars on his body that were unaccounted for. His lack of skill building when it came to socialization and with school." When Sweinhagen asked J.W. about his mother, he would "completely shut down [and] evaded the questions all together," which suggested to her that "he's not ready to process his trauma." Sweingarden opined that J.W. was not ready to be "around his mom" or "live with his mom" or to participate in family therapy. Sweinhagen agreed that there was no "timeframe" to know when he might be ready because "it's individualized." When asked how J.W. felt about the prospect of returning home, his "direct wording * * * [was] no."

7.

{¶ 18} Anna Leck, who treated R.W. for trauma, testified that she presented with "negative self-worth, feelings of detachment from others and anxiety." R.W. told Leck that mother's discipline included "whooping and being hit" and that R.W. was "fearful" of her. R.W. also reported that mother "encouraged [her older brother, S.W.] to discipline [her] as well." R.W. "does love and miss her mom, but she has been very clear that she does not want to live with her mom," in part, because she feared being "hit again."

{¶ 19} Although mother was not asked to participate in family counseling at the Cullen Center, Sweinhagen did offer to "keep in contact" with her, given that it was a "trying time." During the sessions between the two, mother did not acknowledge the trauma that she had caused. Instead, mother's "focus" was on how her kids "perc[eived] her," rather than on focusing on "what they've been through." Based on their conversations, Sweinhagen made the following recommendations to LCCS: (1) that mother receive more parenting classes because "it wasn't evident that [mother] * * * [was] able to offer different and caring ways." (2) that mother receive "more intense trauma therapy" to help her process her own past trauma; and (3) that mother's new husband be included in counseling sessions "to have his participation in the healing." Once visits were suspended by the trial court, however, mother and husband temporarily failed to answer or return LCCS phone calls.

## Mother

{¶ 20} Mother testified that she is employed as a home health aide, working three days per week. Her husband, J.F., whom she married in 2018, works at a factory.

8.

Mother and J.F. live in a three bedroom, two bath home and have resided there, under lease, for 15 months, as of the hearing date.

{¶ 21} Mother testified that she has been diagnosed with bipolar disorder, post-traumatic stress disorder, severe depression and mood swings. She admitted that she supplemented her prescribed medications by smoking marijuana.

{¶ 22} Mother admitted to "putting [her] hands on" her children, but she denied claims of "daily whoopings." She offered no specific explanation as to the cause(s) of J.W.'s scars and marks "across his body," other than to say that he likes to "climb on top of stuff" and "wrestl[e] with his siblings" and that he had "impetigo on his skin." On the other hand, mother did admit to "hurt[ing] [R.W.] in numerous ways" and to telling her older son that "when your sister [hits] you for no apparent reason, yes, hit her back." Although she disavowed a previous statement—made during a therapy session—that, to "spare the rod" is to "spoil the child," she still believes in "tough love * * * if the time is right."

{¶ 23} Mother steadfastly denied claims of physical abuse—made by the children—that were alleged to have occurred during her visits at LCCS, dismissing them as "lie[s]" and claiming that she would not "jeopardize" losing her kids.

{¶ 24} Mother claims that she now understands the importance of considering a child's age and developmental ability when imposing discipline, and she gave specific examples of how she would individualize her treatment of R.W. and J.W. She also said she would give "more praise, more attention, more love," while also giving them "their own space" and "time to themselves."

9.

## The Guardian Ad Litem

{¶ 25} Guardian Chris Kimberly (hereinafter the "GAL") was appointed on August 13, 2019 as S.W. and R.W.'s guardian and J.W.'s guardian ad litem. As part of her independent investigation, the GAL observed five or six visits, met with the children, mother, mother's husband, the caseworkers, school counselors, R.W.'s therapist, and foster parents. Her permanent custody report and recommendation, dated October 8, 2020, was received as an exhibit at trial. The report documents S.W.'s claim to the GAL that, "prior to removal, Mother 'whooped' [R.W.] and [J.W.] multiple times every day."

{¶ 26} Mother told the GAL "many times that her kids were lying [when they said they did not] want to come home" and that "the only trauma that they had experienced was being removed *from her*." (Emphasis added.) According to the GAL, mother "consistently" demonstrated a lack of insight by blaming "the Agency" for her children's trauma, rather than herself. It was not until the month of trial—October of 2020—that mother acknowledged "that she needed to change" and "what the children have been through with her." The GAL called mother's participation in case plan services "lackluster," citing Harbor progress notes which contain "a lot of blame" and "a lot of denial." She doubted that mother has gained the "insight," despite two years of case-planning, to "change the outcome." The GAL concluded that mother failed to remedy the conditions that led to the children's removal.

{¶ 27} The GAL also testified that it was in the best interests of the children if LCCS was awarded permanent custody. In her opinion, it would not be "safe" for the

10.

children to be returned to their mother's care, and she noted that "[n]one of the children want to go home" because they "are still really scared of their mother." We discuss the GAL's testimony in greater detail in the next section.

### D. The court grants LCCS's motion.

{¶ 28} On November 6, 2020, the trial court granted LCCS's motion, terminating all parental rights and awarding permanent custody of S.W., R.W., and J.W. to LCCS. As discussed, only mother appealed. Accordingly, we confine our review of the evidence to the information that pertains to mother, except to note that the fathers were properly served and summoned with the complaint in this case.

{¶ 29} Mother assigns the following error for our review:

> I. The trial court erred in finding by clear and convincing evidence that the children could not be placed with mother within a reasonable time and that it is in the best interest of the children to terminate appellant-mother's parental rights and to award permanent custody of the children to Lucas County Children Services ("LCCS").

### III. Law and Analysis

{¶ 30} R.C. 2151.414 sets forth "specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re A.M.,* Slip Opinion No. 2020-Ohio-5102, ¶ 18, citing *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 22. As relevant here, the court must find by clear and convincing evidence "(1) that one or more of the conditions in R.C. 2151.414(B)(1)(a)

11.

through (e) applies and (2) that a grant of permanent custody is in the child's best interest. R.C. 2151.414(B)(1)." *Id.*

{¶ 31} R.C. 2151.414(B)(1)(a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent; subsection (b) requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; subsection (d) requires a finding that the child has been in the temporary custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period; and subsection (e) requires a finding that the child or another child the parent had custody of has been adjudicated abused, neglected, or dependent on three separate occasions.

{¶ 32} Here, the juvenile court determined that R.C. 2151.414(B)(1)(a) applies to the facts of this case. Therefore, the court was required to consider whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.*, 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 42-43.

12.

{¶ 33} On appeal, mother challenges some, but not all, of the juvenile court's findings with respect to Section (E), i.e. that the children should not, and could not within a reasonable time, be placed with her. She also challenges the trial court's best interest finding.

{¶ 34} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But, while we review the evidence and consider the witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re. P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal citations omitted.) *In re C.P.*, 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

{¶ 35} In its decision, because the court found that R.C. 2151.414(B)(1)(a) applies, it examined the R.C. 2151.414(E) factors. It found that Sections (E)(1), (2), (4), and (14) apply as to mother. Those sections provide,

13.

(E)  In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence.  If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

{¶ 36} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a

termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14.

**The evidence supports the trial court's finding that the children could not be returned to the mother's care within a reasonable time or should not be returned.**

{¶ 37} Mother challenges the court's findings only with regard to Section (E)(2) and (4). Accordingly, we begin with those factors.

{¶ 38} As to Section (E)(2), the court found relevant that mother has been "linked" to mental health services for the "duration of this case" but had "revoked" her medical releases, precluding the caseworkers, GAL and the children's therapists from "get[ting] updates on her progress." The court also observed that mother "continues to deny having negatively impacted her children through her actions." (J.E. at 6).

{¶ 39} On appeal, mother argues that LCCS presented "no medical or psychological" evidence to demonstrate "the specific need for services." Alternatively, mother argues that, assuming there was a need, there is no evidence that the "underlying etiology of the need for services in any way affected [mother's] ability to parent her children." (Appellant's brief at 10).

{¶ 40} In other words, mother's lack of acknowledgement continues. We find mother's argument to be both perplexing—given her testimony that she suffers from multiple and significant mental health challenges—and wrong. In fact, LCCS presented evidence that, following mother's dual assessment by a licensed professional, individualized therapy was recommended. And, a year into case planning services,

16.

Sweinhagen, a licensed clinical counselor, recommended "more intense trauma therapy" for mother and an additional parenting course (at a Renewed Mind) to help mother develop "different and caring ways." R.W.'s counselor, Anna Leck, testified that it was critical for mother to develop those parenting skills because "if a parent is unable to accept full responsibility and accept that 'what I did is going to cause continual fear,' and be able to validate and accept [the child's] feelings without getting defensive, then it can really harm the traumatic healing process and coping with that trauma." In short, we reject mother's argument that LCCS failed to present evidence supporting the need for professional case-planning services. We further find that competent, credible evidence exists that supports the trial court's finding under R.C. 2151.414(E)(2).

{¶ 41} As to Section (E)(4), the trial court found that mother demonstrated an unwillingness to provide an adequate permanent home by failing to "consistently participate in her own counseling; * * * fail[ing] to keep in contact with [R.W. and J.W.'s] counselors; * * * [and] fail[ing] to recognize her own role in the trauma the children have faced."

{¶ 42} On appeal, mother acknowledges "some inconsistency [early on] in engaging in individual therapy," but she claims to have made "reasonable efforts" since "early 2019."

{¶ 43} Mother's claim falls flat, in light of the fact that she revoked her medical releases *after* her supposed change-of-heart, not to mention her insistence—as late as August of 2020—that she "never did anything to harm her children and that she has never done anything to make them fearful of her." Mother also offered no explanation for her

17.

failure to attend the recommended parenting class, other than to claim that she was "trying to get in contact" with them. Based upon our review of mother's testimony at trial, she remains steadfast in her unwillingness to accept any responsibility for the conditions that led to the children's removal. And, her endorsement of "tough love * * * if the time is right" demonstrates that she lacks, then and now, any understanding of the harm her "daily whoopings" had on her children. A parent "is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing [a child's] removal." *In re A.L.A.*, 11th Dist. Lake Nos. 2011–L–020 and 2011–L–021, 2011–Ohio–3124, ¶ 108. (Finding that mother was not entitled to more than the 18 months that had elapsed since the case plan in that case was filed). In sum, we find that the record contains clear and convincing evidence to support the trial court's finding under Section (E)(4).

{¶ 44} Even if the Section (E)(2) and (4) determinations were not supported by the record, the trial court was only required to make findings under one subsection of R.C. 2151.414(E) to support its decision. *In re C.F.* at ¶ 50, citing *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus; *see also In re. Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, ¶ 38. Here, the trial court also found that the children could not or should not be placed with mother under Sections (E)(1) and (14), and mother does not challenge the court's findings under those sections.

{¶ 45} For the record, we note that the trial court cited mother's "inconsistent attendance" in her own counseling and her failure to maintain contact with The Cullen Center with respect to (E)(1). (J.E. at 6.) With respect to both (E)(1) and (14), the court found relevant the fact that mother refused to acknowledge that "her own behaviors and

18.

actions" led to the continued removal of the children and her "unwilling[ness]" to acknowledge past trauma or to prevent it from reoccurring. (J.E. at 7.) The record more than supports the trial court's findings.

{¶ 46} In sum, we find that competent, credible evidence supports the trial court's finding under R.C. 2151.414(E)(1), (2), (4) and (14) as to mother. Therefore, we find that the trial court did not err in finding that the children could not be placed with mother within a reasonable time or should not be placed with her.

**The evidence supports the trial court's finding that an award of permanent custody to LCCS is in the children's best interest.**

{¶ 47} In making a best-interest determination, R.C. 2151.414(D)(1) requires the court to consider all relevant factors, including:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 48} After hearing the evidence, the trial court concluded under R.C. 2151.414(D)(1)(a), (b), (c), (d), and (e) that awarding permanent custody to LCCS is in the children's best interest. Thus, under Subsection (a), the court determined that all three children are "thriving" in foster care and that R.W. and J.W., who had "significant behavioral issues," have "improved dramatically since their contact with [mother] ceased." Under Subsection (b), the court found—after direct discussions with S.H. and the testimony of the caseworker, GAL, and the therapists—that it is "abundantly clear" that the children "have expressed a desire not to return to [mother's] care." Under Subsection (c), the trial court found that the custodial history of the children supported permanent custody. At the time of trial, the children had been in temporary custody for 22 consecutive months. Under subsection (d), the court found that the children were in need of permanency and that there was "no alternative plan * * * possible," other than awarding permanent custody to LCCS.

{¶ 49} On appeal, mother argues, generally, that the trial court erred in its best interest determination but fails to support her claim with any evidence from the record.

{¶ 50} We call attention to the testimony of the GAL, who described all of the children as "happy" in their current placement. For example, S.H.—who was 16 at the time of trial—has "blossomed" and "done tremendously" since his removal. He has done "very well [at his new] school" by "catching up" with his classmates, despite starting off a full year "behind." The foster parents told the GAL that S.H. is "very responsible" and

20.

"popular" at school and has "a lot of opportunities now that he didn't think he would have if he stayed with [mother]." Likewise, R.W. has made "a lot of strides" at her second foster home and enjoys having an older foster-sister, though she continues to have "active imaginary friends." J.W.'s behaviors have also improved "tremendously." For example, speech therapy has helped his speech, and he has also shown improvement in "not shutting down," and "staying on track." Also, his "really difficult challenging behaviors [discussed previously] really improved" after visits with mother were suspended. J.W.'s school performance also "dramatically improved." Such evidence, combined with the GAL's testimony that the children "do not wish to return" to mother, a position they have "maintained since about December 2019," supports the trial court's finding that awarding LCCS permanent custody was in the children's best interests.

{¶ 51} After an independent review of the record, we find that there was competent, credible evidence presented to support the juvenile court's determination under R.C. 2151.414(B)(1)(a) that S.W., R.W., and J.W. could not be returned to mother within a reasonable time or should not be returned to mother, and that an award of permanent custody to LCCS was in the children's best interests under R.C. 2151.414(D)(1). Therefore, we find that the juvenile court's award of permanent custody to LCCS in this case was not against the manifest weight of the evidence. Accordingly, mother's assignment of error is not well-taken.

### IV. Conclusion

{¶ 52} For the reasons expressed above, we find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of

21.

the evidence.  We find that mother's assignment of error is without merit.  Therefore, the

November 6, 2020 judgment of the Lucas County Court of Common Pleas, Juvenile

Division, is affirmed.  Pursuant to App.R. 24, costs of this appeal are assessed to mother.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.             _____
                                                  JUDGE
Thomas J. Osowik, J.        

                                          _____
Christine E. Mayle, J.                                   JUDGE
CONCUR.

                                          _____
                                               JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.

23.