[Cite as *In re J.F.*, 2021-Ohio-2301.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re J.F.

Court of Appeals No.  L-21-1004
L-21-1013

Trial Court No.  JC 19274734

**DECISION AND JUDGMENT**

Decided:  July 6, 2021

* * * * *

Laurel A. Kendall, for appellant.

David T. Rudebock, for appellee.

* * * * *

**DUHART, J.**

{¶ 1} This is a consolidated appeal from the December 23, 2020 judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated appellants' parental rights, and granted permanent custody of J.F., the child, to appellee, Lucas County Children Services ("LCCS" or "agency").  For the reasons that follow, we affirm.

{¶ 2} Appellants set forth two assignments of error:

I. The trial court abused its discretion when it terminated mother's parental rights, when she had rebutted the presumption against termination of rights pursuant to RC 2151.414(E)(11) by becoming and remaining complaint [sic] with her case plan services, and when time remained on the case.

II. The evidence supporting the trial court's finding that the minor child here could not be returned to her father was not clear and convincing with [sic] he was compliant with his mental health services; was employed and had stable housing; when no concerns for his parenting were expressed at trial; and when time remained on the case.

**Background**

{¶ 3} Appellant, T.F., is the biological mother ("mother") of six children, fathered by different men. The youngest of mother's children is J.F., who was born in May 2019, and is the subject of the permanent custody award in this appeal. Appellant, Ja.F., is the biological father ("father") of only J.F.

{¶ 4} In June 2018, LCCS became involved with mother and three of her children ("the children"), as they were homeless. Following an investigation, LCCS learned the children: did not have medical care due to mother's failure to follow up; were not regularly attending school; and had been physically abused on a daily basis by mother.

{¶ 5} In July 2018, mother and father were married.

2.

{¶ 6} On September 26, 2018, LCCS filed a complaint and request for emergency shelter care in Lucas County Court of Common Pleas, Juvenile Division, case No. JC18270763, and interim temporary custody of the children was awarded to LCCS. In December 2018, an adjudication hearing was held, after which two children were found to be dependent and neglected and the third child was found to be dependent, neglected and abused. Case plan services were offered including housing, mental health treatment, substance abuse treatment, domestic violence classes and parenting classes. Mother mostly had supervised, Level 1, visits with the children before her visits were suspended, in late October 2019, due to concerns with mother: slapping one child; behaving inappropriately with the children; and attempting to manipulate the children's disclosures. After visits were suspended, the children's behaviors greatly improved, and the children all indicated they did not wish to visit with mother.

{¶ 7} In July 2020, LCCS filed a motion for permanent custody of the children. In October 2020, a trial was held, and on November 6, 2020, the court issued its judgment entry awarding permanent custody of the children to LCCS. The court found, inter alia: mother attempted to comply with the case plan requirements, but failed to take advantage of the services available to her; mother struggled to accept any responsibility for her actions and the negative impact her actions had on the children; mother did not acknowledge the role she played in the children's removal; mother failed to recognize the trauma she inflicted on the children; the children have thrived in substitute care; the

3.

children's wishes were to remain out of mother's care; mother failed to remedy the problems that caused the children to be placed outside of the home; mother suffers from a chronic mental or emotional illness so severe that she is unable to parent the children; mother demonstrated a lack of commitment to the children by her unwillingness to provide an adequate permanent home; and the children were abandoned by their fathers. Mother appealed; the judgment was affirmed. *See In re S.W., R.W., J.W.*, 6th Dist. Lucas No. L-20-1204, 2021-Ohio-2065.

{¶ 8} While in the midst of the case with the children, mother gave birth to J.F., in May 2019. LCCS filed a complaint in dependency and motion for shelter care hearing in Lucas County Court of Common Pleas, Juvenile Division, case No. JC19274734. A hearing was held, and interim temporary custody of J.F. was awarded to LCCS.

{¶ 9} On July 15, 2019, mother and father were ordered to pay child support of $80.00 per month for J.F. On January 16, 2020, mother filed a motion to terminate her child support, as she claimed she is actively engaged in case plan service and is unable to work.

{¶ 10} On May 20, 2020, mother filed a motion for legal custody of J.F. and to determine support and visitation, and father filed a motion to change disposition and for legal custody of J.F. On August 12, 2020, a hearing was held and LCCS was granted an extension of its temporary custody of J.F.

{¶ 11} On September 23, 2020, LCCS filed a motion for permanent custody of J.F. On December 2 and 7, 2020, the dispositional hearing was held, on December 10,

4.

2020, the court announced its decision, finding LCCS's motion for permanent custody well-taken. On December 23, 2020, the court issued its judgment entry. Mother and father appealed.

## The Dispositional Hearing

{¶ 12} LCCS called several witnesses to testify, including caseworkers and the guardian ad litem ("GAL"). Stipulated exhibits were admitted. Mother and father testified and called two witnesses. The testimony relevant to the appeal is summarized below.

## Therapist

{¶ 13} Berdonna Green testified she is a clinical therapist at Harbor Behavioral Health ("Harbor"). She started seeing father in December 2019, and father also had services at Harbor when he was a teenager. Father was diagnosed with "Bipolar I," and participates in medication therapy and psychotherapy. Green said father reported experiencing some improvement with depression and in managing or coping with stress.

{¶ 14} Green was not sure how long father and mother have been married. Father told Green that J.F. was not in his care due to the children. Green had heard that father felt sabotaged by one child because that child only thinks of himself and what he can get out of the foster parents.

{¶ 15} Green has seen father for almost a year and he attended about 85 percent of his sessions. In order to complete therapy with Harbor, father would have to report that he has three to five coping skills to help him manage his bipolar, and report a reduction in

5.

his symptoms. Green said father has reported that he has three coping skills. Green stated father is on the path to managing his bipolar disorder. Green has weekly team meetings with the doctors but there is no firm idea of a timeline for father's therapy.

**Charles Allen**

{¶ 16} Allen testified he is the community organizer for Empower 1, which takes homeless families and houses them. The program works in three-year increments to help families restructure their lives, through life planning and financial planning. Typically, the program helps families who are together, but mother and father were in a reunification plan with children services, so it was thought the children would be home within a few months; it is now close to two years. Mother and father "pretty much" engaged in the life services until Covid, and were given space to finish the classes in their reunification plan. Empower 1 offers parenting courses, but mother and father had parenting classes with the reunification plan.

{¶ 17} Empower 1 works with families so they can move into permanent supportive housing or fair market housing, but mother and father's income was not consistent, as it was difficult for them to maintain steady work. Mother tried to work on her obtaining her GED, but no classes were offered due to the pandemic, so she looked for work.

{¶ 18} Allen said it was "very difficult to * * * walk [father] through steps to understand a lot of different things, even how to get his pay stub or what a pay stub was. So we've been working with him on those things." Father's jobs were through a

6.

temporary agency, so Allen did not know if father could not keep a job because of his disability or if the jobs were just short-term. Allen thought it would probably take another year for mother and father to be ready for fair market value housing, and he believed the route for them would be more subsidized housing.

{¶ 19} Mother and father had two initial courses to take with Empower 1, one course was "sort of a life management course which is a lot of time management and how to schedule and put things down and remember when their appointment was," and they also had to attend biweekly meetings. In the beginning "it got a little rough" for them. Allen believed with the proper wrap-support services and further education, mother and father could maintain a child.

**Caseworker Emily Costell**

{¶ 20} Costell testified she was an ongoing caseworker when she became involved with mother and the children in June 2018, as the family was homeless. Mother and father were together for a number of years before they married in July 2018. When mother and the children were staying at a shelter where father was unable to stay, the agency received calls that mother was "whooping" her children and they were screaming and crying.

{¶ 21} Case plan services were offered to mother and father, which included dual diagnostic assessments, parenting and getting stable housing. Although mother did what she had to do to engage in family therapy, the children were not ready to participate in

7.

family trauma therapy. When mother and father found housing, they assumed the children would be returned to them even though the other case plan services had not been implemented. This conversation occurred almost monthly, as mother and father did not understand why the children were not returned to them.

{¶ 22} In June 2020, mother acknowledged that she may have been too harsh with the children, but by August 2020, when Costell stopped working with the family, mother said she never did anything to the children. Costell said father also acknowledged at one point that mother might have gone too far, but he does not always acknowledge it and usually minimizes mother's behavior and the risk she presents to the children.

{¶ 23} Mother and father have said the children were removed because they were black and Costell was white, money-hungry and corrupt. Mother said she had never done anything to make the children fearful and she has never harmed them.

{¶ 24} Costell testified at the permanent custody hearing for the children. The issues which caused mother to lose custody were that she physically abused the children and she had mental health issues. Costell believed mother did not accept responsibility for the trauma the children had gone through.

{¶ 25} Regarding J.F., she was deemed to be dependent, and LCCS received temporary custody of her on July 9, 2019. Mother had Level 1 visits at the agency two days a week with J.F. Costell observed three of mother's visits with J.F. and never saw anything inappropriate. However, Costell received a report from a security officer that in February 2020, mother was focused on doing J.F.'s hair, but J.F. was crying and

8.

screaming. If the security officer looked at mother, she would stop, but if the officer looked away, mother would continue to try to do J.F.'s hair.

{¶ 26} When visits became virtual, on Google Duo, because of Covid, the foster mother reported mother missed visits or was late about six times. Father was not consistent in visiting J.F., as he has missed visits and was late. Mother and father's visits with J.F. were never suspended.

{¶ 27} Regarding housing, Costell said mother and father have housing, through Empower 1, and live in a duplex. The duplex is appropriate and there are no concerns.

{¶ 28} As to father, he was referred in September 2019, to a 12-week parenting program, and he successfully completed the classroom portion in July 2020. He did not complete the observations portion, due to scheduling conflicts and Covid. Costell had concerns with father's parenting ability as it appears he does not understand things that she explains to him, so she did not know if he had a mental health issue or a cognitive delay. Father also disclosed that mother has some anger issues and has been aggressive with the children, but then he denies that he has seen any abuse.

{¶ 29} Father was referred in July 2018, to Unison for a dual assessment, which he completed in mid-July 2018. He had to be re-referred in January 2019, because he was not following through. Then, in September 2019, he wanted to switch providers and go to Harbor. He was referred to Harbor in October 2019, and had three assessments scheduled; he cancelled two and was a no-show for the third. He rescheduled another assessment, which he attended, and he has been compliant with meeting his therapist.

9.

{¶ 30} Costell does not think father has progressed far enough in his services to reunify with J.F. as he still has to work on his mental health, and he is still with mother.

{¶ 31} Costell would have concerns if J.F. were returned to mother soon because J.F. has special needs and she is unable to protect herself or report abuse or neglect or remove herself from those situations. J.F. was referred to Help Me Grow in June 2019, and is still involved with the program. J.F. has sensory and fine motor skill delays, eating issues and was referred to an eye specialist. Costell did not believe J.F. would be safe with mother, and father would not be able to protect J.F.

{¶ 32} Costell stated J.F. has been in the same foster home, but it is not a potential adoptive placement. Costell testified LCCS is asking for permanent custody of J.F.

**Caseworker Rhonda Nicholson**

{¶ 33} Nicholson testified she is an ongoing caseworker for LCCS and has been on J.F.'s case since August 2020; case plan services for mother and father were already in effect. At the time of the hearing, mother still had housing, was engaged in mental health services and was attending new parenting classes. Mother started out rocky with the new parenting classes, as she missed orientation and three appointments. The parent educator did not want mother to continue, but Nicholson convinced her to give mother another chance. Mother has been compliant with the weekly classes since October 16, 2020.

{¶ 34} Since Nicholson was assigned to the case, mother has had Level 1 visits with J.F. Mother never missed a visit, was late or inappropriate. But, Nicholson had concerns about mother's visits with J.F. and her ability to parent J.F. Before mother lost

10.

custody of the children, it was reported the children were afraid of mother and did not want to return home because of the abuse, but mother denied that she had abused them. After mother lost custody, she did not reach out to arrange a final visit with the children. Nicholson contacted mother.

{¶ 35} Father was still engaged with mental health services, he completed parenting classes in March 2020, and he has housing. Nicholson had concerns with father's ability to parent and protect J.F. because he blames the children for J.F. not being home, he feels one child sabotaged the case, he does not believe mother abused or neglected the children or acted aggressively with them, and he does not appear to have any concerns with mother's parenting style.

{¶ 36} With respect to J.F. being placed with a relative, Nicholson testified that on her way into court for the hearing, father asked her if she had contacted his aunt and father said mother's adult son may be a potential placement. Nicholson did not know what father was talking about regarding his aunt, and although mother mentioned her adult son to Nicholson during the first home visit, mother said the previous caseworker did not approve of her son because he was verbally aggressive with that caseworker. Nicholson spoke with Emily Costell and learned the son and his girlfriend were both very aggressive at the initial staffing, and the girlfriend refused to undergo a criminal background check. Costell's supervisor said if the couple was not willing to be cleared through the system, the couple could not be considered for placement.

11.

{¶ 37} Regarding J.F., she is a one year old with developmental delays, she is nonverbal and very small for her age. J.F. falls a lot, has balance issues, is startled by loud noises and has feeding and texture issues. J.F. completed physical therapy before Nicholson was involved, and now has weekly occupational therapy sessions, early intervention services once a month and she sees a GI doctor. The doctor wants J.F. to try milk even though she does not like it.

{¶ 38} The foster mother gives J.F. formula because she is concerned J.F. is not getting enough nutrition. Nicholson said the foster mother is very attentive to J.F.'s needs. Nicholson talked to mother and father about J.F. not liking certain foods and they said she will probably be a vegetarian as she does not like meat.

{¶ 39} Nicholson testified that LCCS is asking for permanent custody of J.F.

**Maternal Grandmother**

{¶ 40} J.F.'s grandmother testified she met J.F. at the hospital when she was born, and she stayed about three hours. Grandmother has had no interaction with J.F. since that day. Grandmother was not sure when J.F. was born.

{¶ 41} Grandmother said mother had six children, including J.F. Regarding the children who were removed from mother's care, grandmother said mother was a very good mother to them, very attentive, she made sure they had something to eat and "somewhere comfortable to lay their head." Grandmother had not seen the children in two-and-a-half to three years.

12.

{¶ 42} Grandmother thought mother had become a better parent and person "because she wasn't working * * * when she probably had the kids. Now she is working and * * * [has] somewhere for them to stay and * * * more money to make sure that they got something to eat." Grandmother retired January 31, 2020, and said she is now able to help mother. Grandmother thought father was "pretty nice, a pretty nice dude. He was pretty kindhearted * * * a mellow dude." He was very good to mother, "[b]etter man than any of her kids' father been I think."

{¶ 43} Grandmother did not know what mother's address was, but knows where mother lives. Grandmother did not know what mother did if the children misbehaved because grandmother "wasn't really around her like that," but mother probably believed in whoopings, as mother was whooped as a child.

{¶ 44} Grandmother was asked how often she sees mother and she said "not real often, but I talk to her all the time. * * * I don't drive and she don't drive so * * * it's not that easy for me to just * * * go get her or go see her." Before LCCS was involved, "I think [mother] lived with me before [J.F.] was born and the kids were little. [Mother] lived with me for a minute. She stayed with me." Grandmother said mother and the children lived with her for maybe two or three years, then mother "wanted to get out and get her own. You know, my apartment wasn't that big. So I let her stay with me * * * for the kids and she could get out and get her own place." Grandmother knew mother and the children were homeless, but she did not have them live with her as "I didn't have enough room for her and the kids to stay with me."

13.

**Maternal Great Aunt**

{¶ 45} Great aunt to J.F. testified she is mother's aunt and grandmother's sister. Great aunt met J.F. in the hospital after she was born, and has only seen pictures of her since.

{¶ 46} Great aunt saw mother with the children about twice a month and mother's "kids were everything to her. * * * And I'm the one that took her to the grocery store and she would buy all these groceries, and she said, girl, I got to feed my kids." Great aunt is there for mother, if mother needs a ride or money.

{¶ 47} Great aunt said mother has had a hard life, and did the best she could with what she knew and "with the kids she did a good job." Great aunt thought mother was "a very good parent." Grandmother lost custody of mother "when [mother] was coming up * * * [then] she eventually got them back." Mother and grandmother "they kind of clashed heads a little bit for a long time." Mother's parents did not have a "very good healthy relationship so [mother] didn't really know too much about healthy relationships and how to bring up a person -- or a child."

{¶ 48} Great aunt did not know mother's address, but she has been to the house several times. The last time was when "my brother got back, and she started using my brother because he has a bigger truck for hauling her groceries back and forth."

{¶ 49} Great aunt has not seen mother parent the children since "they took them away from her." Great aunt said mother did not have the equipment to bring up a child because mother lost her home, she did not have a job, she lost whatever support she had.

14.

Great aunt thought the children were taken from mother because she was homeless. Great aunt "was taking them from hotel to hotel to find them somewhere to stay. I was taking them to shelters. And when they would kick her out of a shelter, I would go pick her up and we would find somewhere else." Great aunt also thought mother did not have the children in school because they did not have their shots and they did not have clothes.

{¶ 50} Great aunt said mother now has the equipment to bring up a child as she has a home, it is furnished, she has a husband who has a job and tries to take care of her. Mother has more support now than she did then.

{¶ 51} Great aunt was asked if she knew the children were found to be abused and great aunt said "I don't think it was by [mother]." Great aunt looked shocked and said she never saw mother punish the children. Great aunt said if she found out a child was abused, that would change her opinion about mother's ability to parent.

{¶ 52} Great aunt thought father "seems to be a very nice young man, hard working. Whenever he gets a job, he did the best he could. He didn't have any transportation so I know at one point he was taking a bike going back and forth to work."

**Mother**

{¶ 53} Mother testified J.F. is 17 months old, and LCCS immediately took J.F. after she was born. Mother was seeing J.F. twice a week for at least a year at the agency in a room with a security guard. After Covid, mother saw J.F. once a week virtually, in a video chat over the phone. J.F. met the children at visits at the agency before mother's visits with the children were suspended in October 2019.

15.

{¶ 54} Mother believed her rights to the children were terminated because she was not acknowledging that she had done something wrong. Mother said, "I can acknowledge and do agree on things that I've done wrong and made mistakes toward my other three kids in which I've learned through the parenting class that I'm going through right now not to do and make the same mistakes again." Mother said she was "[n]ot giving them enough attention, not taking them to they doctor appointments. Not scheduling appointments, and not making sure I had transportation to get them back and forth to their appointments, and not being able to keep a roof over their head." Mother said she has learned "[t]o maintain food, to maintain housing and to maintain the needs, going back and forth to the doctors and making sure her appointments are met and making sure that if I cancel an appointment, that I make sure that I stick to the appointment. And as well that she makes sure that she gets everything that she desires and needs and wants."

{¶ 55} Mother said she made mistakes when she punished the children, as she did not know "how to overcome the overwhelming stress that I was going through and dealing with." She learned to deal with stress by going outside, jogging, seeing family, reading, taking a bath, meditating and listening to music. Before, mother asked grandmother to "keep the kids for a couple of days, * * * just to give me a break from my kids."

{¶ 56} Mother was asked if she heard the testimony about her doing J.F.'s hair and how it was traumatic for J.F. Mother said she heard the testimony and "I don't agree on

16.

that, to agree or disagree. I totally outright as much as possible disagree with that because I would never just let my daughter just keep continuing crying and not asking her if she's okay or give her a hug or kiss. Her [sic] just to say it's okay, I'm just making you beautiful or making you pretty so your hair will be done for the day." Mother thought J.F. "would be fussing and crying, and she * * * just possibly had got up too early that morning. And she be too tired to even want to go through me doing her hair." Mother concluded the foster mother had gotten J.F. up too early.

{¶ 57} Mother did not miss visits but was late to visits "[b]ecause of the time of me coming from the grocery store or coming from another appointment." Mother does not drive, so she walks, bikes or catches the bus. Mother has worked as a home health aide for almost three months, and is getting her GED. Father also works, and the income they make allows them to support themselves. Mother said, "we making so much money they took us off of food stamps because we're no longer getting food stamps. So we're still able to maintain food without having food stamps."

{¶ 58} Mother and father have lived at their home for almost two years, and pay $400 per month in rent. Mother and father also do volunteer work, a class or a meeting with Empower 1 as a requirement for living in the house.

{¶ 59} Mother goes to Harbor for her mental health treatment and she has gone there on and off since 2011. She was diagnosed with posttraumatic stress disorder, bipolar and anxiety. To manage her diagnoses, mother takes medication, plays video games, cooks and cleans. Mother was asked if she takes her medicine as prescribed and

17.

she said "[y]es, I do." She was asked if she took her medicine every day and she said "[y]es, I do." She was then asked if she missed any doses and she replied "I go maybe once -- well, every other day because of the fact of -- because of my job. I don't want to oversleep and be late for my job because it leads me to being late for my job." Mother works four days a week, 8:00 a.m. to 3 p.m. Mother was asked if she has talked to her doctor about the medicine and she replied, "[n]ot lately * * * I plan on letting her know if I can only take it on a day that I don't have to work and the days that I don't have to work to being able to still have the same -- the same effect."

{¶ 60} Mother was asked about the parenting program, in which she had been for the last two weeks, and she said she has learned "physical and verbal * * * redirection * * * [a]nd * * * how to love your child and not be physically harmful toward your child." She thinks these have helped her be a different parent and keep her child safe and protected.

{¶ 61} Mother was asked if she heard testimony that she did not always make the virtual visits and she said she heard it, but it was not correct. Mother was asked if she missed some virtual visits and she responded "I might have missed a couple of them. * * * [T]he lady, [foster mother] was supposed to be getting in contact with me between 1 and 1:30. She would call me at around 12, 1:30. She called me at 12:30 at another time or 1 o'clock and then call me at 12:30 another time. So it varied on what time she would call. So I never knew what time she was going to call on a general basis."

18.

{¶ 62} Mother wanted the court to know that "I know how to maintain and establish clothing for my daughter, maintain food for my daughter, maintain housing and make sure that she's safe and protected. And as well making sure that she has everything that she wants and desires and needs."

{¶ 63} On cross-examination, mother said since the hearing a month earlier, she is no longer smoking marijuana. Mother said she is current with her mental health provider and she remembers telling her counselor that CSB was keeping the children for the money and her son was being coached. Mother said, "[t]he close-knit relationship with me and my son before CSB had taken them, me and my son had a relationship that any mother -- or any mother and son would be jealous of our relationship because of the fact that we were so close that my kids could come and talk to me. They could come and laugh with me. They could come and play with me. We could do anything together that no other mother and son would possibly think to even do."

{¶ 64} Mother said it was traumatic having the children taken away as "my kids are so important to me. And doing their hair, getting their clothes clean, taking them to the shopping mall, taking them shopping and going out to eat, and doing fun stuff with them and traveling with them is something that I had grew up doing -- was traveling with my family every year. That's something I wanted to do with my kids that I can't do now."

{¶ 65} Mother was asked about J.F.'s therapies and she said J.F. went to physical therapy and goes to occupational therapy "to get her coordinated to be able to stretch her

19.

muscles and being able to relax her hands because she was balling up her hands." When asked if those therapies were important for J.F.'s well-being, mother said, "I believe they know about [J.F.], but I don't believe that they know all the time of how [J.F.] could possibly not drink milk at all. That's the part I'm not understanding why she's not drinking milk. But she is in some form of drinking milk, but it's not the type of milk that I'm drinking or her dad is drinking that it would help her bones become stronger so as she grows. Her bones will become stronger instead of brittle."

{¶ 66} Mother was asked about J.F.'s eyes and mother said, "her left eye she has -- I believe it's a stigmatism. I don't know. She told me before it could be, and the doctor told her it would be possibly a tumor. I don't believe it's a tumor. I believe it's a stigmatism that she possibly have in her eye, and she genetically got from me from my young age that I received a stigmatism in my eye. And she's not able to get the one eye to be able to look straight like I'm looking at you." Mother said she asked the foster mother about J.F.'s eye treatment, "and it, like, goes in one ear and other the other." Mother was asked if she recalled saying she did not notice anything wrong with J.F.'s eyes, and she said, "I have pictures where she is not seen with a lazy eye. Her eye is not crossing. Her eyes looked at me like I'm looking at you. And plus my husband has -- he's a first (sic) so I know -- pretty much know my daughter will be looked after."

{¶ 67} Mother said J.F. sees a GI doctor for her stomach "[b]ecause from my understanding * * * she couldn't stand the taste of textures, or she couldn't eat meat or she just didn't want to eat meat." Mother recalled that J.F. had problems tolerating

20.

formulas.  Mother said when J.F. goes home "[i]f [J.F.] she can tolerate milk, there's a certain kind of milk I can give her.  I wouldn't force her to drink milk if she can't drink milk.  But if she can drink milk, yes, I will give my daughter milk so, therefore, she will have some milk that will strengthen her bones."

{¶ 68} Mother said at one time "I did think that she wouldn't need them other therapies, but being that I see that she has special needs, yes, she do need * * * them."  Mother changed her mind "when I seen my daughter * * * have a patch over her eye and understanding that. * * * It's making it strong."

### Father

{¶ 69} Father testified he is married to mother and "I've been living with her for a while now, like, what is it, two years."  J.F. is their child and mother "had two older boys, and they grown now so -- they're -- you know, they pretty much -- they don't say too much bad about their mother as much as they don't really, like, you know try to -- they don't try to -- they don't really try to say anything bad about their mother last time I checked."

{¶ 70} Father was asked, "[t]here are three other children?"  Father replied, "[y]ou said three other children?  No.  No.  No.  There weren't."  He was then asked "so when [LCCS] initially got involved with [mother's] other children, that was before you[?]"  He said "[t]hat was the time when we were separated.  When we got in -- they said we got in a little proclaimed altercation."

21.

**{¶ 71}** Regarding his understanding of LCCS's reasons for removing the children, father said, "[w]ell, when it came down to that, I knew very well. And I witnessed a lot of things that were going on at the time when we were living in shelters. And what they were pretty much saying was that somebody pretty much -- somebody that was next door to us that was, like, a resident at the shelter at that time pretty much said that -- and I wasn't there but when I was there, I didn't see none of the stuff go on." Father was asked the question again, he said, "[w]ell, their concern I feel like they should have did, like, more research before they just took them the way I see it."

**{¶ 72}** Father stated LCCS's allegations were abuse and neglect, but "how can somebody neglect somebody if they keeping their eyes on them 24/7? * * * And then when it come down to abuse, when you all say abuse, I understand the mother, you know, if she choked the child or tried to kill the child or anything like that. But none of that stuff never happened." Regarding concerns with physical abuse, father stated, "[t]o be honest, she probably disciplined them, but it wasn't major. It was more like a warning, like, don't do this again like any mother would do. I mean my momma did it." Father was asked what the physical abuse incidents were and he said, "[t]he incidents that pretty much happened -- I am going to be honest. Me and her used to get in arguments, and the kids used to see that. Yes, we had a rough relationship at one time. Yes, we had a lot of things going on. Yes, she probably got too bothered about certain things. She was probably stressing and over the edge, but at the same time I always used to work things out with her and her kids. There were times when I come out my pocket and she'll come

22.

out her pocket, and we'll feed them. There were times when we would just go to Goodwill because I was budgeting on the checks that I was getting."

{¶ 73} Father thought mother was a really good mother, so he cannot say that her one child was abused. Father said he heard the caseworkers' testimony that he did not understand or believe the allegations or concerns, but he "understood everything. But at the same time I've got to go by the beliefs of the child, and that's understandable. I can do that. But if it's nothing truthful in that, you all -- you know, you all remember the situation to my rights of the constitution. What else can I say?"

{¶ 74} Father said he was concerned because he talked to the one child who said he lost his virginity and had sex with a 24-year old. "So it was like at that time I had to really, you know, remind myself that this lady ain't really paying attention like she's supposed to. * * * LCCS, they got to be responsible and accountable for even allowing that to happen." Father raised the concern because he wants the court to know "I think it's a lot of re-appealing we are doing with case. Because those ain't my biological kids, but for my concern for her, I just wish, you know, they can change this whole matter and do this case over again. You know, to really do their studies on it and really get to know the kids more. Because kids going to tell anybody anything. I was once a kid as well."

{¶ 75} Father was offered case plan services when LCCS first became involved with mother and the children because he was married to her and they lived together. He said, "I ain't gonna to lie, I probably didn't come to every last one of them * * * Emily Costell was giving me my stuff last minute. * * * [S]he really didn't want to put me on

23.

the case for real when her kids got tooken (sic) away." Case plan services continued after J.F. was born, with reunification as the goal.

{¶ 76} Father did not always agree with how mother disciplined the children, "she got this thing, you know, with her that kind of creeped me out. When she got, you know, mad at me when I asked her, you know, don't do that, don't do this, it wasn't like abuse or nothing like that. It was just the way she used to get mad at the kids * * * she'll get -- not violent with them. She would cuss them out, so I would say, no, don't do that * * * don't yell at your child." Father felt like mother would cherish and nourish J.F. because mother "came a long way. Just to be honest with you all, * * * she been doing -- you know, she was doing fine. Plus she understands well what she did wrong on some things. But somebody who put abuse and neglect still doesn't make it right, putting something on someone knowing it's not true." Father said he will protect J.F., as she is his first child.

{¶ 77} Father said visits were going well until one child "made the allegation that her mother allegedly smacked her. * * * [H]ow can you smack somebody when there's full of cameras? * * * [H]ow can the mother smack the child * * * It just -- it's propaganda."

{¶ 78} Father was diagnosed with bipolar during J.F.'s case, and he takes medication which keeps him content. Father agreed with his therapist's report, but he was surprised that she had not had a conversation with the doctor and treatment team. Father thought if the therapist had the conversation and he had successfully completed his mental health care, that would have impacted how LCCS viewed his progress. Father

24.

believed it would have taken his therapist to say that he had coping skills in order for LCCS to say he had successfully completed mental health services, but she did not testify about that. Father said he would continue his therapy, as he is starting to like it because he has someone he can talk to about his problems.

{¶ 79} Father said Rhonda Nicholson told him LCCS's concerns were "my wife. Ain't no -- ain't nothing regarding me. It's something that LCCS not appreciating what my wife did. All she did was speak her mind about some things, and you see what happened." Father said he did everything that he was supposed to do, "[m]y daughter got wipes, * * * Pampers, * * * a bed. * * * What is the problem?" Father stated he learned about safety measures, how to protect his daughter, and patience.

{¶ 80} Father said there was "[n]o proof" of domestic violence between him and mother. Regarding housing, father said "[s]ome people say it's housing assisting, but how is it house assisting when I pay rent and lights and gas? It's not for free." Father believes he can maintain housing. He was asked about getting independent housing, and father said, "just me staying at the place right now, that's independently done. * * * [Y]es it's a program, but it teach you how to manage your own well being."

{¶ 81} Father is currently employed and is still trying to get his GED. When he gets paid, the temporary employment agency takes half "plus the state child support is taking my money too. Every time I get a job, they take about $80 or maybe like $115." Father believes he is in a position to take custody of J.F. As to other services which may be needed, father said, "one thing based on what I'm hearing, that she do need special

25.

needs for her eye doctor, you know, dental sooner or later. Because she's getting bigger. Based on her eating, there's a good chance she might be vegan."

{¶ 82} On cross-examination, father said he had proof that the children were not abused, but "not physical evidence." Father feels railroaded by LCCS because some of the allegations made by the children against mother were not true and the children were "absolutely" taking advantage of their situation with the foster parents. Father does not believe mother smacked the child during a visit. Father does not like Lucas County Child Support taking money out of his paycheck "[b]ecause that's not my baby mama. That's her right there."

{¶ 83} Father said his sisters could watch J.F. while he is working. He was asked where his sisters lived and he said, "[o]ne of my sisters -- I ain't going to lie. To be honest, she live in the Greenbelt. And then I have another sister, and she live in the Greenbelt as well." Father said a lot of people talk bad about the Greenbelt apartments.

{¶ 84} On further cross-examination, father said when he married mother they were homeless. Father admitted he was kicked out of a shelter "[b]ecause of arguing that took place." When the children were removed from mother's care, father was on the case plan, but the caseworker would not let father visit the children. Father heard one child was deemed to be an abused child, but "when you all said that my wife had burnt him -- well, somebody said it. Somebody said that they had checked a burnt mark on his back saying that, I guess, she burned him, and that wasn't even true. * * * He burnt himself." Father said the finding of abuse was wrong and "[i]f you're feeding your kid and clothing

26.

you kid and they have a roof over then head, that's not mistreated. But sometimes parents have to discipline they kids. By law you can hit the child in the buttocks, but not with a belt but you hand." Father acknowledged the children were not seeing doctors because of transportation problems.

{¶ 85} Regarding reports made by the children, father said "yes, you supposed to believe the child, yes. Yes, that's absolutely true. You supposed to believe the child if they got -- if it comes down to abuse, molestation, whatever the case is. But if it's not accurate enough and if you know it's not accurate enough and you know, it just a whole little game of propaganda that you all playing with, yeah, it's going to be a problem." As to the child who said she was slapped by mother during a visit, "[y]ou can't play any little games with your momma based on telling any story."

{¶ 86} Father said LCCS filed the permanent custody motion because mother spoke her mind and father "not agreeing with half of the things that you all saying." Regarding his concerns about the one child having sex, father was asked if he called the agency to report it and he responded "[n]o, not at that time. Well, as a matter of fact I did, but nobody ever answered. If that's what you're talking about, right. Nobody ever did answer. If you're talking about -- or are you talking about me talking about -- [?]" Also, father did not raise the issue at the 90-day review meeting in June 2020, or with the caseworker because he did not think he would be believed.

27.

**Foster Mother and Parents' Rebuttal**

{¶ 87} Foster mother testified she has fostered children for 50 years, and has been caring for J.F. since she was released from the hospital at two days old. J.F.'s difficulties upon leaving the hospital included tremors for the first few months and feeding issues of gagging and vomiting, she could not tolerate milk, she was weak on one side and she could only roll to one side; J.F. was listed as failure to thrive. The agency recommended Help Me Grow for J.F., and she was referred to a gastrointestinal doctor, physical therapy and occupational therapy for her feeding and sensory issues and deficits. Foster mother takes J.F. to appointments and to twice-a-week visitations with mother and father.

{¶ 88} J.F. had an MRI after foster mother noticed problems with J.F.'s eyes and the pediatrician sent J.F. to an eye doctor. J.F. saw the eye doctor in October 2020, and the doctor thought there may be issues with the optical nerve not getting the right blood supply. J.F. was prescribed glasses and an eye patch.

{¶ 89} Foster mother talked to mother and father about J.F.'s services, but "whenever I would bring up anything, the only response I got was if she were with me, she wouldn't have these issues or I don't see these issues." When mother and father were allowed to go to J.F.'s appointments, foster mother would tell them about the appointments, yet mother said she was never told, so the caseworker had foster mother write a list of the appointments for mother. Mother and father went to one appointment, for the GI doctor, although there were at least six appointments on the list. Thereafter,

28.

mother and father did not ask about J.F.'s services, her MRI results or why she had a patch on her glasses.

{¶ 90} Foster mother said father told her that CSB was against him, and the children made up all of the stories about mother.

{¶ 91} Mother testified, in rebuttal, that foster mother told her about four of J.F.'s appointments, but mother "had meetings on the days that she [foster mother] set doctor appointments. One I was able to get to, the other one right before the pandemic had pretty much sent me to not being able to go because I had other appointments to go to."

{¶ 92} Mother had concerns that J.F. was not drinking milk, and nobody has helped to alleviate those concerns. Mother also had issues with the way the foster mother took care of J.F. because sometimes J.F. would have on dirty clothes that had not been washed, and when mother would change J.F.'s diaper she would "still have stuff in between her legs."

{¶ 93} Father testified, in rebuttal, that his main concern was that J.F. would come to visits with "not good hygiene," and "[t]here were times where it felt like the clothes that she was wearing was already wore before or after. There were times when she would come with * * * snotty nose, * * * face, all crusty. * * * I believe a kid, you know, should be nourished by their hygiene even down to their skin. Plus my daughter got melanin, so it's important." Father stated "[i]t was just my main concern her coming there like that. I didn't like it. * * * Just giving my daughter just any kind of way to me."

29.

**GAL Chris Kimberly**

{¶ 94} Kimberly testified she was the GAL appointed to represent appellant's four children in August 2019, after the previous GAL was reassigned. Kimberly spoke with the previous GAL and received notes and a report. Kimberly conducted an independent investigation, and believes it is in J.F.'s best interest for permanent custody to be granted to LCCS.

{¶ 95} Kimberly had concerns with mother's ability to parent and manage her mental health, and there were concerns with father's ability and willingness to protect J.F. because he believes everything mother says or always takes her side. Kimberly observed mother and father parent the four children throughout the case, and they have not been "capable or able to have gotten all [of] the benefits of services that they really need to parent safely and effectively." Mother was "very, very slow to engage" in some services, she completed some services, some she did not do and some she started but did not finish. Kimberly said a therapist suggested mother could benefit from trauma counseling.

{¶ 96} Regarding visits, prior to Kimberly's involvement, mother and father had Level 2 visits with the children at the agency in a room monitored by agency staff. When Kimberly was appointed, the family was at Level 1 visits at the agency with agency staff supervising. For a very brief time, the parents had Level 2 visits with J.F., until October 2019, when the incident occurred with the one child. At that point, J.F.'s visits moved back to Level 1 and the visits with the children were suspended. Mother was really

30.

consistent with visits while father was a lot less consistent. Before Covid, the GAL observed at least three visits between the parents and J.F.

{¶ 97} J.F. has developmental issues including tremors, clenching, feeding issues and eye issues. She is very small and slow to gain weight. J.F. is in need of continuing services and someone who is diligent about her medical care Kimberly said in March 2020, at a 90-day review meeting, it was brought up that J.F. has a lazy eye, but mother said no, she does not. The proper eye doctor had to be found, then it took six months to get an appointment due to Covid, but it was determined there was nothing wrong with J.F.'s optic nerve.

{¶ 98} Kimberly does not believe mother has made the progress in services and gained the understanding needed to be a safe and secure parent. Mother continued to not take the safety of the children seriously and mother did not seem to take J.F.'s services seriously. Kimberly does not think father has fully benefitted from services so that he would be able to provide an independent level of protection for J.F. It appears to Kimberly that no matter what evidence exists, father will never believe mother was a danger to her children, as father wholeheartedly endorsed her parenting.

{¶ 99} Kimberly was asked about her report, in which it was noted that J.F.'s meconium tested positive for THC. The GAL believed that information was in the complaint.

{¶ 100} Kimberly testified housing was the concern that caused LLCS to become involved with the family, but housing is no longer a concern.

31.

## Juvenile Court's Decision

{¶ 101} In its December 23, 2020 judgment entry, the juvenile court found, by clear and convincing evidence under R.C. 2151.414(B)(1)(a), that J.F. could not and should not be placed with either parent within a reasonable time, and pursuant to R.C. 2151.414(D)(1), it was in the child's best interest to grant permanent custody to LCCS.

{¶ 102} The court noted the parents secured housing through Empower 1, a three-year program, and have been in the program for two years, as of December 2020, and there was testimony that the parents are not qualified for independent housing and it does not appear they will qualify in the near future.  The court referenced caseworkers Costell and Nicholson's concerns with mother and father's ability to parent, and observed that mother continues to deny she abused the children or negatively impacted them, and father believes the children lied about mother abusing them.   The court discussed the parents' visits with J.F.  The court recognized J.F. has special needs, is on a specialized diet and has therapy and doctor appointments.

{¶ 103} The court mentioned the parents' mental health services, that mother suffers from chronic mental illness which is so severe that she is unable to provide an adequate permanent home for J.F., and mother has difficulty understanding certain concepts, like wanting to give J.F. milk when she cannot tolerate it.  Father has difficulty expressing himself and has tangential and odd thinking, according to his Harbor records.

{¶ 104} The court concluded R.C. 2151.414(E)(1), (2), (4), (11) and (14) applied, and found the following: the parents failed to substantially remedy the problems causing

32.

J.F.'s removal, and although the parents made some progress in their case plan services, they did not make significant progress to support reunification with J.F., including still having visitation with J.F. under the most restrictive level offered by LCCS; the parents suffer from chronic mental illness which is so severe that they are unable to provide an adequate permanent home for J.F.; the parents demonstrated a lack of commitment to J.F. by failing to consistently support or visit J.F. or attend her medical and therapy appointments.; mother had her parental rights to a sibling of the child involuntarily terminated, and the parents failed to show, by clear and convincing evidence, that they can provide a legally secure permanent placement and adequate care for the health, welfare and safety of J.F.; the parents are not able to care for J.F.'s basic necessities, including her special needs; and the parents did not make enough progress in their case plan services to remedy the reasons for removal, including physical abuse.

{¶ 105} The court also concluded, under R.C. 2151.414(D)(1)(a) and (d), that granting permanent custody to LCCS is in J.F.'s best interest, and further found: J.F. was doing well in her foster home where she has been since birth; J.F. has special needs which are all being met at her current placement; and J.F. needs a legally secure permanent placement which cannot be achieved without granting permanent custody to LCCS, as no alternative plan is possible.

### Standard - Permanent Custody

{¶ 106} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence: (1) the existence of

33.

at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6; R.C. 2151.353(A)(4).

{¶ 107} R.C. 2151.414(B)(1)(a) provides that "the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent." R.C. 2151.414(E) requires a juvenile court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any one of sixteen factors are met. R.C. 2151.414(E)(1) - (16).

{¶ 108} R.C. 2151.414(E)(1), (2), (4), (11) and (14) provide:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *;

* * *

34.

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

* * *

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

{¶ 109} To satisfy the best interest prong of the permanent custody test, the agency must establish, by clear and convincing evidence, that permanent custody to the agency is in the best interest of the child based on an analysis under R.C. 2151.414(D). The juvenile court must consider all relevant factors, including: the interaction and interrelationship of the child with parents, siblings, relatives and foster caregivers; and the child's need for permanence. *See* R.C. 2151.414(D)(1)(a) and (d).

{¶ 110} Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. In order to determine whether a juvenile court based its judgment on clear and convincing evidence, the reviewing court examines the record to decide whether the trier of fact had sufficient evidence before it to satisfy the appropriate degree of proof. *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

### First Assignment of Error

{¶ 111} Mother argues she made sufficient progress in her case plan services to rebut the presumption that she failed to provide clear and convincing evidence to show that she can provide a legally secure placement for J.F. and adequate care for J.F.'s health, welfare and safety, despite the prior termination of parental rights. Mother contends she was compliant with her case plan services, including parenting, visitation, housing and mental health treatment, and time is "available under the statute to address residual parenting issues for this child." Mother submits "she acknowledged from the

36.

witness stand that she had made mistakes in treatment and discipline" of the children. Mother maintains the juvenile court abused its discretion by terminating her parental rights to J.F.[1]

{¶ 112} A review of the record shows LCCS established, inter alia, that mother's parental rights to the children had been involuntarily terminated. Mother had the burden of proving, by clear and convincing evidence, that she remedied the condition which caused the termination of her parental rights.

{¶ 113} Upon review, we find mother did not present evidence which produced a firm belief that she can provide adequate care for J.F.'s health, safety and welfare. While mother may have been compliant with many of her case plan services, J.F. has special needs, not all of which mother has appreciated, and J.F. requires therapies and doctors' visits, most of which mother has not attended. Transportation issues were one of the reasons mother did not take the children for medical care in the previous case, and transportation continues to be a problem for mother, as she does not drive.

{¶ 114} In addition, mother has failed to show that she sincerely recognizes and acknowledges the role she played in traumatizing the children as a result of physically abusing them. Thus, mother did not prove by clear and convincing evidence that she remedied the condition which caused the removal of the children and the termination of

---

[1] Abuse of discretion is not the appropriate standard of review in a termination of parental rights case. Rather, we review the record to determine whether the juvenile court's findings are supported by clear and convincing evidence. *See In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 19.

37.

her parental rights to the children in the previous case. Further, while there may be time remaining on J.F.'s case, LCCS has been involved with mother for well over two years, and the same issues remain. Mother has not established that if she were given more time, she would rectify the issues.

{¶ 115} Therefore, contrary to mother's claims, we conclude the juvenile court did not commit an error of law, and there was clear and convincing evidence supporting the juvenile court's termination of mother's parental rights to J.F. Accordingly, the first assignment of error is not well-taken.

### Second Assignment of Error

{¶ 116} Father asserts LCCS did not prove by clear and convincing evidence that J.F. could not be returned to him, in part because five months were still available to him during which J.F. was still eligible for continued temporary custody by LCCS. Father argues he was compliant with his case plan services, except visits, as he completed a dual diagnostic assessment and the classroom portion of parenting classes, he is employed, he has stable housing and he has engaged with mental health care providers.

{¶ 117} Father admits his visits were not consistent, but claims there is no allegation of improper handling of J.F. when he did visit her. Father also acknowledges he did not believe the children were truthful when they said mother abused them, and he notes he was not a party to the previous case because the children are not his.

{¶ 118} Upon review, we find LCCS did present evidence which produced a firm belief that J.F. cannot be returned home to father, as LCCS offered witness testimony that

38.

father cannot provide adequate care for J.F.'s health, safety and welfare. Although father was somewhat compliant with his case plan services, the progress he made was marginal, particularly as it directly relates to J.F. and her care. Father's visits with J.F. were inconsistent, and father does not appear to fully comprehend J.F.'s developmental disabilities and other medical issues. J.F. has had many therapy and doctors' appointments, but father attended only one appointment. Just like with mother, transportation is an issue for father because he does not drive. What is more, father does not seem to believe that mother abused the children, as the majority of the time, he claims the children lied about being abused by mother.

{¶ 119} Finally, despite time remaining on J.F.'s case, father has produced no evidence to suggest that if he were given additional time, he would complete the steps necessary to reunify with J.F. Throughout these proceedings, father has shown a lack of progress in the areas directly concerning J.F., he failed to participate in all case plan services, and he did not consistently acknowledge the abuse suffered by the children at mother's hands. Father has been provided with ample opportunity to take corrective steps and has been unable or unwilling to remedy and improve the situation.

{¶ 120} We therefore conclude the juvenile court did not err when it terminated father's parental rights to J.F. The court considered J.F.'s best interest, and placed her best interest above all else. The court properly found, and the record clearly shows, J.F.'s need for a legally secure permanent placement could not be achieved without a grant of

39.

permanent custody to LCCS. Accordingly, the second assignment of error is not well-taken.

{¶ 121} On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellants are ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Gene A. Zmuda, P.J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.